**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AFA INVESTMENT INC., et al.,[1] | ) | Case No. 12-11127 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| AFA INVESTMENT INC., et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 14-50134(MFW) |
| | ) | |
| DALE T. SMITH & SONS MEAT PACKING COMPANY. | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**[2]

This Memorandum Opinion addresses the Motion of AFA Investment Inc., et al. (the "Debtors") for Summary Judgment on a preference complaint filed against Dale T. Smith & Sons Meat Packing Company (the "Defendant"). Because the Court finds that there are no issues of material fact, the Motion for Summary Judgment will be granted. The Courts finds that the Defendant has established a partial new value defense but has not proven the transfers were in the ordinary course of business.

___

[1] The Debtors are: AFA Investment Inc.; American Food Service Corporation; American Fresh Foods, Inc.; American Fresh Foods, L.P.; AFA Foods, Inc.; American Fresh Foods, LLC; Fairbanks Reconstruction Corporation; American Foodservice Investment Company, LLC; and United Food Group LLC.

[2] This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.  BACKGROUND

The Debtors were once one of the largest ground beef processing operations in the United States. (Adv. D.I. 1, ¶ 14.) The Debtors produced more than 500 million pounds of ground beef products annually, primarily for distribution to restaurants and retail grocery stores across the United States. (Id.) After filing their chapter 11 petitions on April 1, 2012, the Debtors confirmed their joint plan of reorganization on March 7, 2014. (D.I. 1 & 1499.)

The Defendant provided beef processing and packing services to the Debtors from 2005 through the petition date. (Adv. D.I. 34, Ex. 1.) During the preference period, the Defendant received twenty-five transfers (the "Transfers") totaling $2,273,500.00 from the Debtors. (Adv. D.I. 27, Ex. A, ¶ 10.)

On April 16, 2014, the Debtors filed a complaint seeking to avoid and recover the Transfers. (Adv. D.I. 5.) The Defendant filed an answer to the complaint on September 12, 2014. (Adv. D.I. 12.) The parties attended mediation on March 11, 2015, but did not reach a settlement. (Adv. D.I. 21.) On September 30, 2015, the Debtors filed a Motion for Summary Judgment which seeks judgment for $215,664.61 of the Transfers. (Adv. D.I. 26.) A notice of completion of briefing on that motion was filed on November 29, 2015, and the matter is now ripe for decision. (Adv. D.I. 38.)

II.  JURISDICTION

The Court has core jurisdiction over this adversary proceeding.  28 U.S.C. §§ 1334 & 157(b)(2)(F).  See <u>Stern v. Marshall</u>, 131 S. Ct. 2594, 2617 ("A preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because then the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.") (citation and internal quotations omitted).

III. DISCUSSION

The Debtors argue that their Motion for Summary Judgment should be granted because there are no disputed issues of material fact as to the prima facie elements of the preference action and they are entitled to judgment as a matter of law on all of the Defendant's asserted defenses.

The Defendant argues that the Motion should be denied because the Debtors have not established that the Defendant received more than it would otherwise have obtained in a hypothetical chapter 7 liquidation.  In addition, the Defendant asserts that the ordinary course of business defense applies to the Transfers.

A.  <u>Standard of Review</u>

Summary judgment is proper if there is no genuine dispute over any material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.  <u>See also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

The movant bears the burden of establishing that no genuine dispute as to any material fact exists.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585 n.10 (1986).  A fact is material when it could "affect the outcome of the suit."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  Once the moving party establishes a prima facie case in its favor, the opposing party must go beyond the pleadings and identify specific facts showing more than a scintilla of evidence that a genuine dispute of material fact exists.  <u>See, e.g.</u>, <u>Anderson</u>, 477 U.S. at 252; <u>Matsushita</u>, 475 U.S. at 585–86; <u>Michaels v. New Jersey</u>, 222 F.3d 118, 121 (3d Cir. 2000).

The party contending that the transfer falls under the exceptions in section 547(c) bears the burden of proving that assertion by a preponderance of the evidence.  <u>Burtch v. Detroit Forming, Inc. (In re Archway Cookies)</u>, 435 B.R. 234, 240 (Bankr. D. Del. 2010).  "In the context of a motion for summary judgment, the burden of proof remains with the party asserting the non-

avoidability of the transfer; the Debtor simply needs to point to the absence of such proof to make its case." Id.

B. Elements of an Avoidable Preference

Under section 547(b), the Debtors can avoid as a preference a transfer:

>   (1) to or for the benefit of a creditor;
>   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>   (3) made while the debtor was insolvent;
>   (4) made . . . on or within ninety (90) days before the date of the filing of the petition . . . ; and
>   (5) that enables such creditor to receive more than such creditor would receive if --
>   (A) the case were a case under chapter 7 of this title;
>   (B) the transfer had not been made; and
>   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The Debtors argue that they have established a prima facie case with respect to each of these five elements. However, the Defendant contends that there is an issue of material fact with respect to element five.

1. Hypothetical Liquidation

The Debtors assert that section 547(b)(5) is presumptively satisfied because the Defendant is an unsecured creditor, and unsecured creditors are slated to receive less than a 100% distribution under the Debtors' confirmed chapter 11 plan. (Adv. D.I. 27, Ex. A, ¶ 16.) Though the Debtors contemplate further claim objections and are thus unable to complete their claims

5

reconciliation, they assert that the combination of secured and unsecured claims greatly exceeds the value of available assets.

The Defendant concedes that it would have received less than 100% of its hypothetical claim in a chapter 7 liquidation. However, the Defendant contends that the Debtors did not take into account its potential 503(b)(9) claims which it asserts would receive a 100% payout in a chapter 7 liquidation. The Defendant further argues that the Debtors have offered no evidence regarding the estimated distribution in a chapter 7 liquidation and therefore have failed to carry their burden.

Section 547(b)(5) requires that a creditor receive more than it would have in a chapter 7 liquidation before a transfer is deemed avoidable. 11 U.S.C. § 547(b)(5). Whether a transfer meets the test of section 547(b)(5) requires the formulation of a hypothetical chapter 7 distribution of a debtor's estate as it existed on the petition date. <u>Savage & Assoc. v. Mandl (In re Teligent, Inc.)</u>, 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008). Because the Defendant received 100% of what it was owed for the Transfers, the Court need only find that the Defendant would have received less than 100% in a hypothetical chapter 7 liquidation. <u>Total Tech. Serv., Inc. v. Whitworth (Matter of Total Tech. Serv., Inc.)</u>, 150 B.R. 893, 903 (Bankr. D. Del. 1993) ("[A]s long as the [hypothetical] distribution pays less than one-hundred percent to unsecured creditors, § 547(b)(5) is satisfied.").

In the instant case, the declaration of David Beckham, the Debtors' former chief restructuring officer and current Plan administrator, estimates no recovery for general unsecured creditors and a reduced recovery for section 503(b)(9) claimants. (Adv. D.I. 27, Ex. A, ¶¶ 1, 16.)  Mr. Beckham's declaration is sufficient to establish that the Defendant would receive less than a 100% recovery in a hypothetical chapter 7 liquidation, even if a portion of its claims are afforded section 503(b)(9) status.  See Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech., Inc.), 107 B.R. 698, 701 (B.A.P. 9th Cir. 1988) (holding that an affidavit of the debtor's comptroller without any corroborating evidence regarding hypothetical chapter 7 distributions was sufficient to support a grant of summary judgment in favor of the debtor); Giuliano v. RPG Management, Inc. (NWL Holdings, Inc.), No. 08-12847, 2013 WL 2436667, at *4-5 (Bankr. D. Del. June 4, 2013) (concluding that the declaration of the accountant for the debtors' estates, stating that unsecured creditors would receive less than 100% in a hypothetical chapter 7 liquidation is sufficient evidence to satisfy the section 547(b)(5) element); Tire Kings of Am., Inc. v. Hoffman Tire Co. (In re Tire Kings of Am., Inc.), 164 B.R. 40 (Bankr. M.D. Pa. 1993) (finding that the plaintiff satisfied section 547(b)(5) simply because the liabilities listed in the petition were

greater than its assets). Therefore, the Court concludes that the Debtors have satisfied their burden under section 547(b)(5).

Having met all the requirements of section 547(b), the Court concludes that the Debtors have made a prime facie showing that the Transfers were preferential. Once the plaintiff has made a prima facie showing that a transfer constitutes a preference under section 547(b), the burden shifts to the defendant to establish a defense under section 547(c). 11 U.S.C. § 547(g).

C. <u>New Value</u>

Both parties agree that the Defendant is entitled to apply the subsequent new value defense to reduce the net preference amount. <u>See</u> 11 U.S.C. § 547(c)(4). However, the parties disagree on the amount of new value given. Surprisingly, the Debtors' approach attributes <u>more</u> subsequent new value than the Defendant asserts. The Defendant contends that it offered new value reducing the alleged preference balance to $538,004; the Debtors assert new value provided by the Defendant reduces the alleged preference balance to $216,284.[3]

The subsequent new value defense provides that a transfer is not avoidable to the extent that said transfer was:

> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of a debtor –

---

[3] This new value calculation is $619.39 more than the number reached by the Debtors' expert ($215,664.61). The Debtors adopt the smaller of the two figures for purposes of their motion. (<u>See</u> Adv. D.I. 27, n.4.)

8

>   (A) not secured by an otherwise unavoidable security
>   interest; and
>   (B) on account of which new value the debtor did not
>   make an otherwise unavoidable transfer to or for the
>   benefit of such creditor.

11 U.S.C. § 547(c)(4). Any new value qualifying under section 547(c)(4) must be given after a transfer from the debtor to the creditor to qualify under this affirmative defense. In re Wadsworth, 711 F.2d 122, 123 (9th Cir. 1983).

Courts in this district have followed the "subsequent-advance" approach, which allows new value for unpaid and paid invoices, provided the paid invoices were not themselves paid by an "otherwise unavoidable transfer." Miller v. JNJ Logistics LLC (In re Proliance Int'l, Inc.), 514 B.R. 426, 438 (Bankr. D. Del. 2014); Wahoski v. American & Efrid, Inc. (In re Pillowtex Corp.), 416 B.R. 123, 130 (Bankr. D. Del. 2009). The Debtors' expert applied the "subsequent-advance" approach, while the Defendant's expert used only unpaid invoices in computing new value.

The Court follows the "subsequent-advance" approach in the instant case. Accordingly, the Court concludes that after applying the Defendant's subsequent new value defense, the net recoverable preference equals $215,664.61.

D. Ordinary Course of Business Defense

The Defendant also asserts that the Transfers were made in the ordinary course of business under section 547(c)(2). The Debtors argue that the Defendant has failed to carry its burden

of proving this defense under either the "subjective test" or the "objective test." 11 U.S.C. § 547(c)(2)(A), (B).

    1.  <u>Subjective Test</u>

Under the subjective test, the Court must decide whether the Transfers occurred in the ordinary course of business between the debtor and the creditor. 11 U.S.C. § 547(c)(2)(A). To make this determination, courts generally consider the following factors:

> (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.

<u>Archway Cookies</u>, 435 B.R. at 241-42 (citation omitted). In determining ordinary course of dealing, the timing of payments is of particular importance. <u>Id.</u> at 243 (quoting <u>Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)</u>, Adv. No. 08-51184, 2009 WL 2004226, at *5 (Bankr. D. Del. July 9, 2009). The Debtors focus exclusively on the timing of payment factor in support of their contention that the Transfers were not ordinary under the subjective test.

The Defendant asserts that late payment from the Debtors was an ordinary occurrence throughout the parties' historical dealings. The Debtors respond that the difference in payment timing between the historical period and the preference period

demonstrates that the Transfers were not ordinary under the subjective test. In support of this contention, the Debtors assert that 97% of all invoices in the parties' historical relationship were paid between 16-30 days after the invoice date. (Adv. D.I. 27, Ex. G.) In contrast, 96% of the Transfers were made <u>after</u> 30 days. (<u>Id.</u>) In addition, the Debtors assert that of the approximately $13 million in historical transfers between the parties, none were paid later than 35 days. (<u>Id.</u>) During the preference period, however, 71.7% of all invoices were paid <u>after</u> 35 days. (<u>Id.</u>) The weighted average of the invoice-to-payment period nearly doubled from 22.43 days during the parties' historical relationship to 43.95 days during the preference period. (<u>Id.</u>)

The Court agrees with the Debtors. Even if the Debtors' payments to the Defendant were late historically, the near-doubling in average timing of payments from the historical period to the preference period is sufficiently significant to defeat the ordinariness of the Transfers. <u>Radnor</u>, 2009 WL 2004226, at *6 (holding that the doubling of average number of days to payment between the historical period and the preference period made the payments outside the ordinary course of dealings between the plaintiff and defendant). Therefore, the Court concludes that the Defendant has not carried its burden under the subjective test.

2. <u>Objective Test</u>

The objective test examines "ordinary business terms" in relation to general norms within the creditor's industry. <u>Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)</u>, 18 F.3d 217, 224-25 (3d Cir. 1994). Even if the challenged transfers were irregular, they may be considered ordinary for purposes of the objective test if they were consistent with the patterns within the relevant industry. <u>Bohm v. Golden Knitting Mills, Inc. (In re Forman Enterps., Inc.)</u>, 293 B.R. 848, 860 (Bankr. W.D. Pa. 2003). The creditor's industry is the measure for ordinariness under the objective test. <u>See</u> <u>Sass v. Vector Consulting, Inc. (In re Am. Home Mortgage Holdings, Inc.)</u>, 476 B.R. 124, 140-41 (Bankr. D. Del. 2012).

The Defendant argues that the Transfers were made according to ordinary business terms. In support of this contention, the Defendant's expert witness relied on data produced from BizMiner, a leading producer of industry statistical reports. (Adv. D.I. 34, Ex. A, 5.) The Defendant's expert considered a BizMiner industry-wide report showing the average days that receivables were outstanding ("DSO") was 51.18 days in 2010, 46.25 days in 2011, and 22.25 days in 2012. (<u>Id.</u>) The Defendant's expert also considered a BizMiner report that only took into account companies in the Defendant's sales class. (<u>Id.</u>) That report

showed an average DSO of 41.96 days in 2010, 43.16 days in 2011, and 17.46 days in 2012.  (Id.)  The Defendant's expert opined that the improvement in collection periods from 2010 to 2012 may be attributed to improving market collection in the industry.

The Defendant's expert also evaluated industry data from Risk Management Association ("RMA"), a publisher of annual statement studies in which financial ratio benchmarks are reported by industry.  (Id.)  The RMA data included information from analyzed financial statements from April 1, 2010, to March 31, 2011, from companies in the Defendant's industry with a similar size.  The report indicated a median DSO of 27 days, with most firms collecting accounts receivable between 17 and 30 days.  However, the Defendant's expert attributed less weight to the RMA data because it was based on significantly fewer firms.

After considering all the reports, however, the Defendant's expert concluded that the Debtors' payments to the Defendant during the preference period which ranged from 27 to 59 days outstanding is not outside the ordinary business terms of the industry.  That conclusion was based solely on the BizMiner industry-wide data for 2010, when the average collection period was 51.18 days.  (Id. at 6.)

Although the Debtors' expert used the same data sources relied upon by the Defendant's expert, he disagrees with the expert's methodology.  Chiefly, the Debtors' expert disagrees

with the Defendant's use of industry data from 2010 and 2011 to establish a baseline to compare transfers taking place from January to March of 2012.  The Debtors' expert asserts that while the Defendant's expert acknowledged that the collection period was improving from 2010 to 2012 as a result of improvement in the industry, he continued to rely upon data from the earlier years to establish an upper benchmark.

The Court agrees with the Debtors.  Despite acknowledging that the shortening of average DSOs in 2012 was likely the result of better industry-wide collections, the Defendant's expert continued to rely on data from 2010 – a period with an average industry-wide DSO (45 days) double that of 2012 (22 days).  The 2012 average DSO for companies in the same-sales class as the Defendant was even shorter, averaging 17.46 days.  (Adv. D.I. 34, Ex. A, 5.)  The use of 2010 industry DSO data is inappropriate given that none of the Transfers satisfied a 2010 invoice.  With DSOs decreasing substantially, it is clear that industry members in 2012 were not facing similar conditions as the members surveyed in the 2010 BizMiner report.  (Id.)

Although the Defendant's expert attributed less weight to the RMA reports, his limited reliance on that data is similarly problematic.  For instance, the Defendant's expert relied on an RMA report for a period spanning April 1, 2010, to March 31, 2011, despite the fact that a report was available for April 1,

2011, to March 31, 2012, which covers the entire preference period. In contrast, the Debtors' expert relied on the latter RMA report. Based on that report, the national industry DSO for the latter period averaged 20 days.

Consequently, based on the more recent reports, the Court concludes that the Defendant has failed to demonstrate that the Transfers were consistent with ordinary business terms in its industry because they averaged <u>43.95</u> days as opposed to the industry average of 20 days. For these reasons, the Court finds that the Defendant has not met its burden in proving its ordinary course of business defense under the objective standard.

E.   <u>Pre-Judgment Interest</u>

The Debtors seek an award of prejudgment interest on the ultimately recovered preference amount. It is within the Court's discretion to grant prejudgment interest in actions brought under section 547. <u>Hechinger Investment Co. v. Universal Forest Products, (In re Hechinger Inv. Co. of Delaware, Inc.)</u>, 489 F.3d 568, 574 (3d Cir. 2007). Section 550 of the Bankruptcy Code allows the Plaintiff to recover the value of property transferred under section 547. The policy of section 550 is to restore the estate to the full value of the asset transferred to the preferred creditor, thereby compensating the estate for the loss of the time value of the asset. <u>Springel v. Prosser (In re Innovative Commc'ns Corp.)</u>, 2011 WL 3439291, *49 (Bankr. D.V.I.

15

Aug. 5, 2011) ("[A]n award of prejudgment interest in an avoidance action furthers the congressional policies of the Bankruptcy Code by compensating the estate for the time it was without the use of the transferred funds."). Prejudgment interest may be recovered "from the date of the commencement of [an] action at the federal judgment interest rate in effect as of that date." Id. at *49. The interest rate pursuant to 28 U.S.C. § 1961(b) is the rate applicable to one year Treasury bills for the week preceding the date the complaint was filed. Id. The applicable prejudgment interest rate is accordingly 0.13%. (See Adv. D.I. 27, Ex. L.)

Based on the foregoing, the Court will award prejudgment interest of 0.13% from the date the complaint was filed through the date of judgment.

IV. CONCLUSION

For the foregoing reasons, the Debtors' Motion for Summary Judgment will be granted in the principal amount of $215,664.61, plus prejudgment interest of 0.13% from the date of the filing of the complaint through the date of entry of judgment.

An appropriate order follows.

Dated: March 9, 2016                    BY THE COURT:

*[signature]*
Mary F. Walrath
United States Bankruptcy Judge